[No. 44364-0-I.   Division One.   February 5, 2001.]

THE CITY OF SEATTLE, *Respondent*, v. BURLINGTON NORTHERN RAILROAD COMPANY, *Petitioner*.

*Daniel L. Kinerk* (of *Kroschel Gibson Kinerk Reeve, L.L.P.*), for petitioner.

*Mark H. Sidran, City Attorney,* and *Patricia E. Nellermoe* and *Steven L. Gross, Assistants,* for respondent.

GROSSE, J. — The clear language of the Interstate Commerce Commission Termination Act (ICCTA)[1] grants authority to the Surface Transportation Board (STB) over a broad range of railroad activities including switching operations of trains. Enforcement of Seattle Municipal Code (SMC) 11.66.080 and 11.66.100 impacts switching activities and is preempted. In addition, the ordinances are subject to preemption by the Federal Railroad Safety Act of 1970 (FRSA) (49 U.S.C. §§ 20101-21311).

## FACTS

Between May 1996 and May 1997, Burlington Northern Railroad Company (BNSF) was cited at least 19 times for violations of two City of Seattle ordinances. Those ordinances are SMC 11.66.080, the "blocking ordinance," and SMC 11.66.100, the "peak hours ordinance." Those ordinances provide as follows:

**SMC 11.66.080 Blocking use of street when switching.**

A. No person who is responsible for the operation of any railroad train or car which is engaged in switching shall direct the operation of or operate the same in such a manner as to prevent or interfere with the use of any street or alley for purposes of travel, or impede property access, for a period of time longer than four (4) consecutive minutes.

B. A time interval between successive switching operations shall be provided if the initial switching operation prevents or interferes with the use of the street or alley for purposes of travel or property access, in order to allow the waiting traffic to proceed, provided that the time interval between successive switching operations need not exceed two (2) consecutive minutes.

---

[1] The ICCTA abolished the Interstate Commerce Commission, created the Surface Transportation Board, and granted the board jurisdiction over certain interstate rail functions and proceedings.

**SMC 11.66.100 Switching during peak traffic hours.**

No switching movement shall be made on or across any arterial streets, between the hours of seven a.m. (7:00 a.m.) to nine a.m. (9:00 a.m.) and four p.m. (4:00 p.m.) to six p.m. (6:00 p.m.), except on Sundays and public holidays.

In proceedings below, both the Seattle Municipal Court and the King County Superior Court rejected BNSF's arguments that the ordinances were void for vagueness and a violation of the commerce and due process clauses of the United States Constitution. Those courts also rejected the arguments of BNSF that the ordinances were preempted by the ICCTA and FRSA.

On appeal, BNSF claims the King County Superior Court erred in affirming the decisions of the Seattle Municipal Court by failing to find that the ICCTA or the FRSA preempted application of the current state (municipal) law regulating the operation of its trains.

## DISCUSSION

As set forth by the Ninth Circuit Court of Appeals in *City of Auburn v. United States Government*,[2] Congress and the courts have long recognized the need to regulate railroad operations at the federal level. BNSF claims the two instant City of Seattle ordinances constitute regulation of rail transportation and are preempted by federal law. We agree.

■ ■ The preemption doctrine is rooted in the Supremacy Clause and grows from the premise that when state law conflicts or interferes with federal law, state law must give way.[3] Congress may signify a clear and manifest intent to preempt in three ways: (1) "express," where Congress expressly defines the extent of the preemption; (2) "field," where Congress regulates an area so pervasively

---

[2] *City of Auburn v. United States Gov't*, 154 F.3d 1025, 1029 (9th Cir. 1998).

[3] *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 662-64, 113 S. Ct. 1732, 123 L. Ed. 2d 387 (1993).

that an intent to preempt a field may be inferred; and (3) "conflict," where Congress enacts a law that directly conflicts with state law.[4]

█ BNSF correctly cites two sections of the ICCTA which expressly grant exclusive authority to the STB over railway operations. Section 10501 of the ICCTA, which governs the board's jurisdiction, states the STB will have *exclusive* jurisdiction over "the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State."[5] The same section sets forth that "the remedies provided under this part with respect to regulation of rail transportation are *exclusive* and *preempt* the remedies provided under Federal or State law."[6] This language is clear, broad, and unqualified. It grants the STB jurisdiction over the listed activities.[7] These provisions have been ruled an "express preemption clause" evidencing Congress's intent to preempt state regulatory authority over railroad operations.[8]

█ As in the *City of Auburn* case, here the City of Seattle claims that regulation of the use of the streets by BNSF through these ordinances is a valid exercise of its police powers and does not actually conflict with federal law. However, in the *City of Auburn* case, the City argued that its permitting regulations were "environmental" and not addressed by the ICCTA. The City attempted to distinguish environmental regulations from economic regulations and suggested that its environmental regulations were only an exercise of traditional police power. The court disagreed stating: "[T]he pivotal question is not the nature of the state

---

[4] *Teper v. Miller*, 82 F.3d 989, 993 (11th Cir. 1996).

[5] 49 U.S.C. § 10501(b)(2) (1997).

[6] 49 U.S.C. § 10501(b) (1997) (emphasis added).

[7] *City of Auburn*, 154 F.3d at 1030.

[8] *CSX Transp., Inc. v. Ga. Pub. Serv. Comm'n*, 944 F. Supp. 1573, 1581 (N.D. Ga. 1996).

regulation, but the language and congressional intent of the specific federal statute."[9] The Ninth Circuit held that the fact the ICCTA does not specifically identify the state regulation is not relevant when it is shown the act's intent is to occupy that area of regulation. In response to the City's argument, the court stated:

> Additionally, given the broad language of § 10501(b)(2), (granting the STB exclusive jurisdiction over construction, acquisition, operation, abandonment, or discontinuance of rail lines) the distinction between "economic" and "environmental" regulation begins to blur. For if local authorities have the ability to impose "environmental" permitting regulations on the railroad, such power will in fact amount to "economic regulation" if the carrier is prevented from constructing, acquiring, operating, abandoning, or discontinuing a line.[10]

Here, the City of Seattle claims the ordinances are merely local traffic regulations which are not expressly preempted, or preempted in any other way, specifically because there is no conflict between the ICCTA and the city's traffic ordinances. We agree that state and local governments may retain certain police powers and may apply nondiscriminatory regulation to protect the public health and safety, but under the ICCTA the actions or regulations of those governments may not have the effect of foreclosing or restricting the railroad's ability to conduct its operation or otherwise unreasonably burden interstate commerce.

SMC 11.66.080 and 11.66.100 as currently written are overbroad and seek to overly restrict railroad operations, specifically the ability of BNSF to switch over its tracks when necessary for the conducting of interstate commerce. While we could foresee properly drafted ordinances which serve to prohibit the intentional and unnecessary blocking of the roadways as a valid police power, the current ordinances interfere with the railroad's ability to conduct the activity specifically set forth in 49 U.S.C. § 10501(b)(2)

---

[9] *City of Auburn*, 154 F.3d at 1031 (citing *Shaw v. Delta Air Lines*, 463 U.S. 85, 95, 103 S. Ct. 2890, 77 L. Ed. 2d 490 (1983)).

[10] *City of Auburn*, 154 F.3d at 1031.

(1997). Therefore the ordinances infringe on the STB's exclusive jurisdiction to regulate the railroad's operations. This determination is in accord with the holding in *City of Auburn*. If the court were to allow local authorities to impose regulation upon railway operations under a police power rationale, a railroad might be prevented from operating a line.[11] The court in *City of Auburn* went on to state: "We believe the congressional intent to preempt this kind of state and local regulation of rail lines is explicit in the plain language of the ICCTA and the statutory framework surrounding it."[12]

Because congressional intent is clear, and the preemption of rail activity is a valid exercise of congressional power under the Commerce Clause, the decisions below must be reversed.

■■ Additionally, though not necessary to our determination above, we further express our disagreement with the City of Seattle's view that the ordinances are not preempted under the FRSA.[13] The FRSA preempts state or municipal " 'laws regulations, orders, and standards related to railroad safety.' "[14] As in the case of *CSX Transportation, Inc. v. City of Plymouth, Michigan*, the ordinances do not on their

---

[11] *City of Auburn*, 154 F.3d at 1031.

[12] *City of Auburn*, 154 F.3d at 1031 (citing *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 486, 116 S. Ct. 2240, 135 L. Ed. 2d 700 (1996)).

[13] The FRSA preemption clause provides:

Laws, regulations, and orders related to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force a law, regulation, or order related to railroad safety until the Secretary of Transportation prescribes a regulation or issues an order covering the subject matter of the State requirement. A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety when the law, regulation, or order—

(1) is necessary to eliminate or reduce an essentially local safety hazard;

(2) is not incompatible with a law, regulation, or order of the United States Government; and

(3) does not unreasonably burden interstate commerce.

49 U.S.C. § 20106 (1997).

[14] *CSX Transp., Inc. v. City of Plymouth, Mich.*, 86 F.3d 626, 629 (6th Cir. 1996) (quoting 49 U.S.C. § 20106) (emphasis omitted).

face make reference to railroad safety. As did Plymouth, Michigan, the City of Seattle claims the ordinances do not regulate any aspect of railroad safety, but were enacted as traffic ordinances to promote the general welfare of its residents, especially during peak commuting hours. However, the City's argument does not preclude a finding that the ordinances are "related to" railroad safety, if the ordinances have a connection with railroad safety. As in the *City of Plymouth, Michigan* case, compliance with the challenged ordinances would require additional, shorter, or faster trains. There was testimony below that the only way BNSF could comply with the ordinances would be to increase the speed of the trains over the tracks and/or increase the number or volume of such trains. This in turn would likely increase the accident rate which, "unquestionably relate[s] to railroad safety."[15] The City of Seattle's ordinances as currently written relate to railroad safety and the ordinances are preempted under the FRSA.

The decision of the King County Superior Court is reversed and the citations issued to BNSF under the ordinances are dismissed.

KENNEDY and APPELWICK, JJ., concur.

Review granted at 144 Wn.2d 1001 (2001).

---

[15] *City of Plymouth, Mich.*, 86 F.3d at 629-30.